## INTERNATIONAL CORK CO. v. NEW PROCESS CORK CO.

(Circuit Court of Appeals, Second Circuit. February 16, 1925.)

No. 158.

1. **Patents** ⊙▷175—**Describing one way of carrying out process sufficient.**

It is only necessary, in a process patent, to point one way of carrying out the process.

2. **Patents** ⊙▷157(1) — **Patentee may define terms used.**

A patentee may define his own terms, regardless of common or technical meaning, and his definitions should be accepted in construing the patent.

3. **Patents** ⊙▷81—**Evidence of prior use must be clear and satisfactory.**

Evidence of prior use to defeat a patent must be definite and certain.

4. **Patents** ⊙▷328 — **Alberti, 1,234,109 and 1,234,711, for bottle closure and process of making, held valid and infringed.**

The Alberti patents, No. 1,234,109, for process of making bottle closures, and No. 1,234,711, for the product of such process *held* valid and infringed as to claims 5 and 6 of the first and claim 3 of the second patent.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in equity by the International Cork Company against the New Process Cork Company. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 295 F. 539.

Newell & Spencer, of New York City (Emerson R. Newell, of New York City, of counsel), for appellant.

Livingston Gifford, of New York City (William H. Davis, of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. The appellant sues on two patents, the first No. 1,234,109, granted July 24, 1917, on an application filed June 23, 1913, renewed April 19, 1917, and the second, No. 1,234,711, granted July 31, 1917, on an application filed August 26, 1913, and renewed December 23, 1916. The first is for a process of manufacturing bottle closures, and the second is for closure for receptacles. Claims 1 to 6 of the first patent and claims 1 to 5 of the second are involved.

Bottle caps made of metallic shell and the cork disk cemented therein were old, and

were made for many years under the Painter patents, Nos. 792,285 and 887,838, and also the Wheeler patent, No. 887,883. Such prior art is referred to in the patent in suit. Fusible gum, as copal or resin, was put into the cup-shaped metallic metal shell, and this cork disk inserted above it. Heat was applied and the gum melted. Pressure was then applied against the cork disk, and the cap held under the pressure for a sufficient time, until the cement was hardened by a cooling process. The Painter process patent, No. 792,284, referred to this cooling process to harden the binding medium. The art was desirous of accelerating the manufacture, through hardening the fused medium, and men directed their efforts to find some method to accomplish this result. Automatic machines with improvements could rapidly turn out caps, but the production was delayed because of the necessary delay in holding this cork cap under pressure while adhesion was obtained by cooling. If speed of production was obtained, caps could be made cheaper.

It is asserted that, by the patents in suit, the speed of production has been doubled, so that now 250 per minute may be manufactured by a single machine. This is acceded to by some of the appellee's witnesses. The problem was to devise some process which differed from the existing methods under former patents and gain speed by decreasing the period of manufacture, due to delay in cooling. The inventor's claim is that this was accomplished by the use of egg albumen setting by heating method. Under all known methods, it was necessary to melt the adhesive and hold it under pressure until it cooled. Appellant's method accomplished the desired result as to speed, and now the albumen adhesive is used in cap making, having been adopted by most cap manufacturers. It is not affected by weather conditions, as hot days; fire hazard has been reduced, and dangers of bad sticking have been eliminated; practically 100 per cent. of the disks are stuck to the tin. Puffer caps—that is, those that bulge up by the disk being forced away from the tin, due to internal gas pressure—have been reduced to a minimum. Some of the caps are decorated, and the damage or injury by heat is negligible, because the heat required need not be even at a boiling temperature. Double production has reduced the cost.

Egg albumen is the white of egg. For commercial purposes, it is the dried, uncoagulated egg. When dissolved in water, it may be used like albumen from a fresh egg. Albumen dissolved in water in concentration will coagulate when heated. Both patents state that, when it reaches a temperature of 140° Fahrenheit, it sets and becomes insoluble. After coagulation, it cannot be brought back to its uncoagulated state. There are but two commercial albumens on the market—egg and blood albumen. The process, as set forth in each patent, is that the cork disk is stuck to the metal shell by a cement which is set by heat—specifically by albumen which is interposed and then coagulated by heat. The albumen referred to could mean only one or two commercially known albumens. The patent says:

"Albumen has been found to be particularly adapted for carrying out the present process, it being inodorous, tasteless, soluble in water before use, and coagulates at 140° Fahrenheit. The assembled closures can be subjected to pressure without changing the chemical properties of the albumen, and when they are, after the pressure is applied and while it is maintained, subject to heat, the albumen is easily coagulated, rendered insoluble, and forms an effective cementing medium for uniting the parts of the closure."

And further:

"The coagulation results in a firm union between the parts of the closure, such union being instantaneous, particularly when albumen is used."

[1] The patents make it plain that the albumen is coagulated or set by heat. They sufficiently disclose to the art, or one skilled in the art, how to use egg albumen as an adhesive medium, and how to carry out the process and produce the caps. The proportions of water and albumen to be used is not set forth. Because of the lack of statement as to it, we do not think the patent is invalid. Any proportions within reason will answer. A. B. Dick Co. v. Barnett (C. C. A.) 288 F. 799. It is only necessary in a patent to point out one way of carrying out the process, and these patents do that. The figures are clear enough in explanation to one skilled in the art. They show that the liquid albumen may be put into a container 12, from which it may be dropped, as shown at 11, into a shell 10, a miniature pan. The cork disk 14 is then inserted. Pressure is then exerted, such as by plunger 15, as shown by Fig. 2, with heat simultaneously applied by any suitable heating means, an example of which is illustrated by the steam plate 16. This sets the albumen (Figs. 1 and 2). Figure 3 illustrates a modified construction, in which a disk or collet

of paper coated with uncoagulated albumen is suggested. The drawings of the second patent show a cap, similar to the figures of the first patent, with the disk stuck in place by the coagulated albumen.

[2] Both patents state that the albumen was preferable in liquid form before coagulation. They distinctly point out that albumen is to be uncoagulated, and that, when coagulated after it is interposed between the disk and the shell, the application of heat will set the albumen or produce adhesion. The degree of heat to be applied is sufficiently referred to. A patentee may define his own terms, regardless of common or technical meaning, and fairness to the patentee requires the court to accept his definition of words, phrases, and terms. Rajah Auto Supply Co. v. Belvidere, etc., Co. [C. C. A.] 275 F. 761. The words of the claims are sufficiently explained in the descriptive part of the specification.

In patent No. 1,234,107, claim 1, the application was made in 1913, but Alberti conceived his idea in 1911. The appellee started making caps in the fall of 1914, which, it is alleged, are an infringement. It uses commercial egg albumen dissolved in water, and its process in all substantial respects is the same as the appellant's. Claim 1 of the first patent accurately describes the appellant's process, and claim 2 is the same as claim 1, except that it adds the words "and in the meantime placing the closure under appropriate pressure." Claim 3 restates claim 2 in different words, and claim 4 adds the "rendered insoluble" feature. Egg albumen is used, which is necessarily rendered insoluble by heat. Claims 5 and 6 specify an adhesive albuminous substance with the application of heat to set the same, and claim 6 then adds the feature of maintaining the parts under pressure. We think that the appellee's process falls within claims 5 and 6.

As to the second patent, the claims are as follows:

"1. A closure for receptacles comprising a metallic cap, a sealing disk, and an interposed heat-coagulating cementing medium.

"2. A closure for receptacles comprising a metallic cap, a sealing disk, and an interposed cementing medium coagulated and rendered insoluble by heat.

"3. A closure for receptacles comprising a metallic cap, a sealing disk or packing of cork or the like, and an interposed cementing medium composed of heat-coagulating albuminous substance.

"4. A closure for receptacles comprising a metallic cap, a sealing disk, and an interposed liquid cementing medium rendered insoluble by heat.

"5. A closure for receptacles comprising a metallic cap, a sealing disk, and an interposed cementing medium rendered insoluble by heat."

Claims 1 to 3 each include a cementing medium, which is specified as coagulated or set by heat. What the appellee does in making its caps is clearly an infringement of claim 3. Claims 4 and 5 do not state the cementing medium as coagulated or set, but say it is rendered insoluble by heat. Nobody has ever used albumen as a cement for this purpose before, and the substitution of an albuminous cement for the earlier resin and waxes produced a patentable invention. Potts & Co. v. Creager, 155 U. S. 597, 15 S. Ct. 194, 39 L. Ed. 275; Edison, etc., Co. v. U. S. Electric Lighting Co., 52 F. 300, 3 C. C. A. 83.

Many patents of the prior art are called to our attention to support the claims of anticipation. Serra, No. 846,251 (1907), used egg albumen in the composition of a cork block, by grinding cork and mixing it with a solution of albumen. That patent says:

"The material is then put in molds and its bulk reduced by pressure, after which the molds are subjected to a temperature of about 212 degrees Fahrenheit in a moist heat, either by introducing it in boiling water or by subjecting it to a jet of steam, in order to coagulate the albumen."

And further:

"It is of the utmost importance that the material be subjected to a moist heat, as otherwise the product made under a high, dry temperature will be found to be of a hard nature, not suitable for the use for which corks are intended."

It will be noted that the claims refer to a moist heat. Serra was after a cork block, which should not be of a hard nature, but soft. Alberti was after a hard cementing of the cork to the tin receptacle, while Serra emphasized the use of albumen; but he says the cork material must be subject to a moist heat, such as by introducing it in boiling water, or by subjecting it to a jet of steam. To have used such a process in producing bottle caps would have had no result for the purposes intended by the patent in suit. It was the teaching of the Serra patent, "as of the utmost importance," that the material be subjected to moist heat. Serra's patent taught the art only that soft cork could be made by his process with moist heat—a mold-

ing process. This is not teaching the art that a cork disk could be cemented into a bottle cap in a commercially successful manner by the use of albumen solution. Nor is the appellant's invention a mere substitution of a known adhesive. Nobody, since 1907, and before Alberti, used this adhesive to stick the cork to tin caps.

In the Plinatus patent, No. 925,233, a method of sealing fruit cans and the like is disclosed. It provided a packing for the old India rubber ring between the top and the can. He takes a rag pulp or paper and suitably treats it, and then impregnates this packing material. "For this purpose white of egg, blood, or egg albumen, or suitable mixture of these substances, may be employed. Casein is also adapted for the impregnation, either alone or mixed with the abovementioned substances." And he says that "by this coagulation, and in consequence of the increase of volume thereby resulting, the joint-making material completely fills up the space between the top or closure and the top of the can, thus forming a permanent hermetic joint."

This idea was not a cement for holding the two parts together, but a packing material, which would swell up and fill the joint by the increase in volume, as might oakum in the seam of a boat, swelling when wetted. We do not think that this was teaching the art that albumen could be used to stick securely a cork disk to a metal cap by dry heat. Plinatus taught the art, so far as caps are concerned, that after the cap had been made, and applied to the bottle, the joint between the cap and bottle could be filled up and sealed against the entrance of air by the joint-filling material he suggests.

The Painter patent refers to a melted and cooled adhesive, and this method was used by the art for many years. The cap, composed of a metal shell and an inserted cork disk, was old, and the sticking was obtained by a melting and cooling adhesive medium, such as sealing wax and fusible gums. This was as far as the art had advanced when Alberti made his invention. The cooling process was slow—at least too slow to accommodate the improved automatic machinery which turned out the caps with such rapidity. The great volume of work and experimentation that was indulged in by men who were interested in this art, all laboring to meet this necessity, indicates the importance of the new idea which has resulted in the patents in suit. To the art it seems a forward step, and has succeeded in bringing about economy in manufacture, speed in pro-

duction, and a cheaper product—cheaper because of the ability to manufacture faster. The outstanding fact is that in all this experimentation of trained men, with some knowledge of egg or blood albumen, no one thought of its use as Alberti made use of it in the patents in suit. It is more than a mere substitution for a new use. Such a substitution, if it was one, was not evident to these experienced men.

We are also referred to the British patents issued to Wittkowsky, No. 8,347 (1891), and the Gardiner, No. 21,774 (1896). The former was for a casein cement for gluing two wooden articles together. The inventor says he takes casein—the coagulated product of milk—and slaked lime, and mixes them together to dissolve the casein. He adds parts of water glass and obtains "a slimy, smearable mass," and says the cement must be dried upon each part before the two parts are brought together. They are then melted by heat. It thus appears that these three ingredients are mixed together, smeared on each surface, and allowed to dry. There is mention of albumen proper, or ox blood. These seem to be mentioned only "for the sake of definition." The inventor there recites that, in order to get a broad scope for his invention, he merely, for the sake of definition, mentions a number of materials which he thinks might possibly be used.

Casein is already coagulated and an insoluble product of milk, and, since it is already a coagulated product, it cannot be brought back to its uncoagulated form, and so cannot be recoagulated. This mere mention of albumen in no way discloses the Alberti process. The Gardiner patent is a casein waterproof glue patent. The parts are smeared with it, put together, and allowed to dry as in the former patent. The United States patent, No. 537,096, later granted to Wittkowsky, has the same disclosure as the earlier British patent, except that parts of the water glass are given and albumen is not mentioned. This would indicate, as one of the experts explained, that albumen with an alkali was unworkable in his method.

The patent to Dunham, No. 695,198, is a process of producing insoluble casein which is said to be suitable for use as a substitute for egg or blood albumen coagulated by heat. The patentee says that the solution is dried out in any suitable way in the form of a film, or it may be dried out by pressing the mixture into the meshes of a cloth, and in allowing it to dry in the form of a thin sheet. After drying, it is subjected to steam under

a pressure of about five pounds per square inch. This process may be compared to the casein drying and subsequent liquefying method of the Gardiner patent. He speaks of it as an "insoluble casein product of such a character that it may be used in the arts as a substitute for insoluble egg or blood albumen." This patent teaches that egg or blood albumen may be coagulated by heat and rendered insoluble, but that was not new, and no use was made of it, such as was conceived by the inventor of the patents in suit.

But it is said that the patent is invalid because of prior uses. The outstanding prior use in this record is that of one McManus, who worked for years trying to develop a successful cement which would avoid the objections of the melted gum adhesive. His experiments were abandoned, because his various ideas proved to be impracticable. He tried a cement which included an albuminous material as one of several ingredients. Because the albumen used was only one of several ingredients, and was rendered inert by the other ingredients used, it resulted in a sticking substance, which was impractical and was abandoned. In 1906, McManus, then engaged in business for himself, made a metal cap. He used the cork disk. During the course of his experiments, he tried a glue consisting of albumen, casein, and borax, with water and some antiseptics. This he called an A B C formula. His trials, however, were not confined to this. He does say he used albumen. How much he does not disclose; his record book as to this was not produced.

An effort has been made to show—to at least give the impression—that albumen was used which did coagulate by heat; but we think the record bears out the claim of the appellant that these words as used include casein, which does not coagulate by heat, because it is already coagulated. Exhibit N admits this. There it is said it had a "casein compound on the inner surface, and cork is fit in on top of that, the cork also having a casein binder." It is an apparent effort to use interchangeably for the experiment casein and albumen. Such interchangeability of words is illustrated in the Wittkowsky patent, where it is said: "Albuminous matters are casein, fibrine, and albumen proper." Casein is an albuminous substance, but it is not albumen, and will not set by heat, which is of the essence of the patent in suit. But, assuming that McManus did use the egg albumen in his A B C formula, it is apparent to us that his use of albumen, casein, and borax composition was not a success, and the

reason seems to be that an alkali, such as borax, must be used with casein to dissolve it before it can be used, but an alkali is the wrong thing to use with egg albumen. It has a decomposing and anti-coagulating effect on the albumen, it causes the cork to turn black—which is what happened with McManus' caps—and renders them unsalable. In his testimony, McManus admitted that some of his caps offered in evidence show that there was a chemical added which caused the quick hardening action on the casein. At best, McManus may be assumed to have used some unknown proportions of albumen. But the outstanding fact is that he was engaged in the same art and desired the same result as Alberti, but was unsuccessful. His ideas produced no forward step in the art. The casein binder poured in was not a success. It requires a drying time to permit the complete adhesion of the article.

[3] McManus formed the present appellee company in 1912, and they made a composition cork in 1914, and started to manufacture bottle caps; but this, we think, was after it was learned what Alberti was doing. The process was commercially used in 1913–1914. It is not proved that whatever albumen he used in his experiments was set in by heat action, as is done in the patent in suit. Therefore there was not the coagulation by heat. What he did depends solely upon his oral testimony. It fails in that definiteness and certainty required as a proof of prior use. The Supreme Court has recently reiterated that "the oral evidence on this point falls far short of being enough to overcome the presumption of novelty from the granting of the patent. The temptation to remember in such cases and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory. Barbed Wire Patent Case, 143 U. S. 275, 284; Loom Co. v. Higgins, 105 U. S. 580, 591." See Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523.

Another prior use is referred to, that of La Porte, who alleges a date of conception as in the spring of 1912. Alberti proves sufficiently that his conception was in the spring of 1911. In the interference proceedings in the Patent Office, this has been so considered and decided in favor of Alberti. In the La Porte experiments, the caps came out hard and coagulated. He tried albumen

with alkali, lime and borates. He got up a long list of available substances, went through the literature of patents, because his directors wanted a method to get greater efficiency. On his hot-water press, the disks were securely sealed in when they came out. The albumen was in a glazed condition, which was thought to prove fusion. We think that La Porte's experiments did not conceive the idea of Alberti. The latter was first to accomplish the desired result. The invention in suit, although simple in its operation, is a valuable step forward in cap-making art and should be protected.

[4] We hold that appellant's claims 5 and 6 of the process patent and claim 3 of the product patent are valid and infringed.

Decree reversed.